[No. A051994. First Dist., Div. Five. Dec. 12, 1991.]

GTE SPRINT COMMUNICATIONS CORP., Plaintiff and Respondent, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant.

828

COUNSEL

Daniel E. Lungren, Attorney General, Richard F. Finn and Marguerite C. Stricklin, Deputy Attorneys General, for Defendant and Appellant.

Richard N. Wiley for Plaintiff and Respondent.

OPINION

HANING, J.—Defendant/appellant State Board of Equalization appeals a summary judgment in favor of plaintiff/respondent GTE Sprint Communications Corporation in respondent's action for refund of surcharges paid pursuant to the California Emergency Telephone Users Surcharge Law (the Act). (Rev. & Tax. Code, § 41001 et seq.)[1] Appellant contends the court erred in determining respondent had no duty to collect the subject surcharge.

### FACTS

This case concerns respondent's payment of a surcharge under the Act for the period July 1, 1977, through December 31, 1983. The parties submitted a stipulated statement of facts, upon which our factual statement is based. A long-distance telephone call involves three discrete steps in the transmission from caller to receiver. The originating call begins at the caller's telephone and is carried over a local telephone company's transmission and switching facilities to the entry point of a long-distance network. This is known as the originating link. The long-distance carrier then transmits the call over its facilities to the exit point of the network in the area where the call is received. This is called the intermediate link. Finally, the call is transmitted over the facilities of a local telephone company to the receiving telephone. This is known as the terminating link. The originating and terminating links are also called "access services," in that they provide long-distance carriers with access to local telephone company facilities that provide the originating and terminating links.

Prior to the 1970s, interstate long-distance telephone services were supplied through a monopolistic joint venture by local telephone companies (LTCs), which provided the originating and terminating links, and American Telephone and Telegraph Company's (AT&T) Long Lines Department, which provided the intermediate link. Many of the LTCs were AT&T subsidiaries known as the Bell Operating Companies (Bell). Such interstate

---

[1]Unless otherwise indicated, all further statutory references are to the Revenue and Taxation Code.

long-distance telephone services were provided pursuant to Federal Communications Commission (FCC)-regulated interstate tariffs. During this monopoly period, intrastate long-distance telephone services were supplied exclusively by the LTCs, which provided all three links. The LTCs were authorized to provide this intrastate service pursuant to state utility commission-regulated intrastate tariffs.

In the late 1970's the FCC decided to license other common carriers (OCCs), such as respondent, to compete with AT&T and the LTCs for interstate long-distance telephone services. The OCCs then provided alternative intermediate links to those previously provided solely by AT&T. To foster competition, the FCC required that the LTCs provide the OCCs with the originating and terminating links needed to complete the OCCs' interstate communication pathways. The terms and conditions of the LTCs' access services were set out in FCC-regulated access tariffs. The OCCs priced their services in part to recover the cost of these access services.

During the relevant period of this action, the LTCs were unable to pass the identity of the originating telephone number (Automatic Number Identification) to the OCCs due to technical limitations. The identification of the location of the point of origin is necessary for the LTCs to determine whether the call is subject to joint venture tariffs for interstate services or to the LTCs' intrastate tariff, and whether taxes and surcharges apply to the call. Thus, calls could originate from any location, pass through one or more LTC end offices and other LTCs or AT&T switching centers and then enter the OCCs' network. Without Automatic Number Identification, the OCCs, including respondent, were unable to determine the point or points of origin of its customers' toll telephone communications and could not selectively block those calls that may have violated the terms of their tariffs, including intrastate calls made.

Effective January 1, 1984, the AT&T/Bell monopoly was dismantled. (See *United States* v. *American Tel. and Tel. Co.* (D.D.C. 1982) 552 F.Supp. 131, affd. *sub nom.*, *Maryland* v. *United States* (1983) 460 U.S. 1001 [75 L.Ed.2d 472, 103 S.Ct. 1240].) As a result, the United States was divided into 161 Local Access Transport Areas (LATAs), and California was divided into 10 LATAs. OCCs such as respondent became inter-LATA carriers supplying telephone communication services between points in different LATAs, but not between points within the same LATA. Thus, the OCCs were able to provide intrastate inter-LATA telephone services, as well as interstate telephone services. After January 1, 1984, the former Bell LTCs were required to provide the OCCs with access equal in price and quality to that afforded

to AT&T. Thereafter, the LTCs were required to pass Automatic Number Identification from the LTCs to the OCCs.

The calls at issue in the instant case are those that entered respondent's network in California and exited respondent's network and terminated in California. These calls were usually intrastate calls, the originating link being an LTC's end office in a LATA in California, the terminating link being on an LTC's facilities in another LATA in California, and the intermediate link being respondent's network. However, the calls could also have been interstate calls. For example, a private-line customer could have called San Francisco by using its private line to call from its Chicago office to its Sacramento office and then have the Sacramento office use respondent's lines to complete the call to San Francisco. In such instance, an OCC would be unable to identify this call as an interstate call. The call could also have entered the originating link at an LTC's end office outside of California, e.g., in Nevada or southern Oregon, and gained access to respondent's network at its nearest switch inside California.

In June 1983, due to the emergence of competition in interstate telecommunications services and the breakup of the AT&T/Bell monopoly, the State of California Public Utilities Commission (CPUC) ordered an investigation to determine whether competition should be allowed in intrastate telecommunications services. The CPUC consolidated its investigation with applications by respondent and other OCCs to provide intrastate telecommunications services, with a complaint by Pacific Telephone and Telegraph Company (PT&T) that respondent and other OCCs were already unlawfully providing such services.

In January 1984, following evidentiary hearings, the CPUC denied PT&T's complaint and granted respondent and the other OCC applicants authority to provide intrastate service between California's 10 LATAs. It also concluded that any prior intrastate telecommunications were incident to lawfully provided interstate services. In this action, the parties stipulated that during the relevant period respondent did not supply any communications services pursuant to California intrastate tariffs. Respondent's first California intrastate tariff became effective on January 13, 1984.

Between July 1977 and March 1984, appellant advised respondent of its obligation as a service supplier under the Act to register and collect taxes from its customers. Respondent registered under the Act in September 1984 and began to collect the tax from its customers the following month.

In 1984, appellant audited respondent's records and determined that respondent was required to pay the surcharge plus interest thereon. The

surcharge was initially assessed for all calls entering respondent's network in California, if the calls also terminated within the state. Later, the surcharge was reduced after estimating the proportion of, and excluding from the surcharge obligation, calls entering respondent's network from outside California. During the relevant period, respondent paid a surcharge of $749,560 plus interest. Appellant issued no regulations clarifying that FCC-regulated services could be subject to surcharge, or advising OCCs that did not have Automatic Number Identification capability of a method for determining the point of origin of calls for purposes of the surcharge.

Following appellant's denial of respondent's request for a refund of the surcharge, respondent filed the instant action for refund. The complaint, filed February 5, 1988, alleged that respondent is not a "service supplier" required to collect the surcharge within the meaning of section 41007, and that any such obligation was excused because respondent was unable to determine the point of origin of its customers' long-distance calls, and therefore unable to determine the exact number of intrastate calls made on its network. The trial court granted respondent's motion for summary judgment and ordered a refund of taxes paid plus interest.

## DISCUSSION

■ Since the issues here involve the application of a taxing statute to stipulated facts, we are confronted solely with a question of law and are not bound by the trial court's conclusions. (*Communications Satellite Corp.* v. *Franchise Tax Bd.* (1984) 156 Cal.App.3d 726, 747 [203 Cal.Rptr. 779].)

■ Appellant contends respondent was a "service supplier" within the meaning of the Act and thereby liable for the surcharge. The Act was enacted in 1976 to provide for the administration and funding of the "911" emergency telephone number system. (See § 41136.) Effective July 1, 1977, the Act imposed a surcharge, or tax (§ 41013) on users of *intrastate* telephone communication services at a specified percentage of the amount the service users paid for such services. (§ 41020.) "Intrastate telephone communication services" is defined as "all local or toll telephone services where the point or points of origin and the point or points of destination of the service are all located in this state." (§ 41010.) Interstate telephone service charges are not subject to the surcharge. Although the service user is liable for the surcharge (§ 41024), the service supplier must collect the surcharge from each service user at the time the service user is billed (§ 41021) and remit the surcharge revenues to the state on a quarterly basis. (§ 41051.) The surcharge required to be collected by the service supplier constitutes a debt owed by the service supplier to the state. (§ 41023.)

As originally enacted, section 41007 defined "service supplier" as "any person supplying intrastate telephone communication services to any service user in this state." In 1986, the Legislature amended section 41007 and redefined "service supplier" to mean, "any person supplying intrastate telephone communication services *pursuant to California intrastate tariffs* to any service user in this state." (Italics ours.) (§ 41007, amended by Stats. 1986, ch. 1477, § 1, eff. Sept. 30, 1986.) Within the same legislation, section 41019 was amended to state: "No surcharge shall be imposed on charges for any types of service or equipment furnished by a service supplier subject to state or federal public utility regulation during any period in which the same or similar services or equipment are also available for sale or lease from persons not subject to state or federal public utility regulation." (§ 41019, amended by Stats. 1986, ch. 1477, § 2, eff. Sept. 30, 1986.) Section 3 of Assembly Bill No. 3195 of the 1985-1986 Regular Session (hereinafter AB 3195), the legislation leading to the enactment of the amended sections, states that sections 1 and 2 of the Act, which amend sections 41007 and 41019, "do not constitute a change in, but are declaratory of, the existing law. It is the intent of the Legislature in enacting this act to clarify existing law." (See Stats. 1986, ch. 1477, § 3.)

Since the parties stipulate that during the relevant period respondent did not supply any communications services pursuant to California intrastate tariffs, it is entitled to a refund of the surcharge paid if the amended version of section 41007 accurately reflects the law existing at the time of enactment. Respondent argues that the Legislature's statement that AB 3195 is declaratory of existing law supports their position.

■ "It is presumed an amendment to a statute operates prospectively unless the Legislature has expressly stated the contrary or, after considering all pertinent factors, there is clear indication of a legislative intent that the statute operate retrospectively. In determining this issue, it is appropriate to consider whether the purpose of the amendment would be served significantly by its application to transactions which preceded the change and the principle that retrospective imposition of increased liabilities is to be carefully avoided." (*Wienholz* v. *Kaiser Foundation Hospitals* (1989) 217 Cal.App.3d 1501, 1505 [267 Cal.Rptr. 1], citations and internal quotation marks omitted; see also *Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1210 [246 Cal.Rptr. 629, 753 P.2d 585].) Where a statute or amendment clarifies existing law, such action is not considered a change because it merely restates the law as it was at the time, and retroactivity is not involved. (*Rodriguez* v. *Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707, 722 [230 Cal.Rptr. 823].)

A review of the legislative history of AB 3195 supports respondent's position. The Assembly Committee on Revenue and Taxation stated: "The Purpose of This Bill is to Prevent the State Board of Equalization From Imposing a Telephone Tax Retroactively on Interstate Carriers." (Assem. Com. on Rev. & Tax., as amended (Apr. 1986).) The Senate Rules Committee Analysis states: "*This bill* redefines the types of service suppliers which are liable for collecting and remitting the emergency telephone users surcharge. Because the bill declares that its provisions are declaratory of existing law, the new definition would apply on a retroactive basis. [¶] . . . [The Act] provides that all service suppliers who provide *intrastate* telephone communication services must collect the surcharge at the time billings are collected from the services user. . . .

"The bill limits the surcharge to telephone service provided by suppliers who are subject to *California intrastate telephone tariffs.* According to the Board of Equalization (BOE), certain companies which were not subject to these tariffs between 1977 and 1984 provided intrastate service in that seven-year period. The board has made a $2 million deficiency assessment on these companies. An unknown amount of intrastate telephone service is currently provided by suppliers not subject to these tariffs.

"Current law also specifies that no surcharge will be levied on any service or equipment during any period in which similar types of services or equipment may be purchased from a service supplier which is not subject to *any* public utility regulation.

"The bill clarifies that this exemption applies when service or equipment is available from a service supplier not subject to *state* or *federal* public utility regulation.

"The Board of Equalization is attempting to collect 911 surcharges from long distance carriers such as [respondent] for intrastate calls made between 1974 and 1984, when the carriers were authorized only to provide interstate service. Due to the configuration of telephone switching equipment, some calls made on such carriers were in fact completely intrastate, which would normally be subject to the 911 surcharge.

"Because the carriers were not authorized to provide the service (the PUC considered the calls to be incidental to authorized services and not unlawful) and the carriers claim they cannot even document the extent of such calls, the carriers believe that they should not be liable to pay the surcharge. The bill 'clarifies' that the surcharge would not apply to intrastate calls placed on such services.

"The dispute is currently undergoing administrative appeal at BOE. If the bill is enacted, there would be no reason to continue the appeal process because the bill is declaratory of existing law, thereby relieving the companies of tax liability.

". . . Because the bill states that its provisions are declaratory of existing law, it would effectively release the suppliers from the potential liability for any surcharges in the years 1977 through 1984. As a result, depending on the resolution of the appeal, the bill could preclude the collection of these revenues." (Sen. Rules Com., Sen. Floor Analysis of AB 3195, as amended (May 1986).)

The Legislative Analysis of AB 3195 states: "Because the bill states that its provisions are declaratory of existing law, it would effectively release the suppliers from the potential liability for any surcharges in the years 1977 through 1984. As a result, depending on the resolution of the [administrative] appeal, the bill could preclude the collection of these revenues." (Legis. Analysis of AB 3195, as amended (May 1986).)

The Ways and Means Committee Analysis of AB 3195 states: "This bill is . . . intended to relieve [respondent] of a potential . . . liability which the Board of Equalization is attempting to assess against [it]." (Ways & Means Com. Analysis of AB 3195, as amended (Apr. 1986).)

In sponsoring AB 3195, respondent and cosponsor MCI Communications argued that the amendment to section 41007 was necessary for the following reasons: (1) The surcharge which was not collected was not based upon revenues which were anticipated, planned for or budgeted; and (2) an interpretation of section 41007 requiring corporations such as respondent to collect the surcharge for the time when they were providing only interstate services in California is inconsistent with legislative intent, and the amendment eliminates any such misinterpretation and clarifies that the surcharge was only required for intrastate telephone communication services provided pursuant to California intrastate tariffs. (Sen. Rules Com., Sen. Floor Analysis of AB 3195, *supra*; Assem. Com. on Rev. & Tax., *supra*.)

Opponents of AB 3195 argued enactment of the bill would: (1) Authorize persons to avoid collecting the surcharge merely by not filing California intrastate tariffs and not registering with CPUC; (2) have a negative impact on audits currently in the administrative petition process and circumvent the administrative appeals procedures; (3) complicate the interpretation of existing law; and (4) set a precedent whereby the state judicial process is circumvented through the legislative process. (Sen. Rules Com., Sen. Floor Analysis of AB 3195, *supra*; Assem. Com. on Rev. & Tax., *supra*.)

The foregoing legislative history reveals that the Legislature intended to clarify the meaning of sections 41007 and 41019 of relieving respondent and other similarly situated OCCs from surcharge liability for the relevant period, i.e., prior to imposition of California intrastate tariffs. Because the legislative history provides a sufficiently clear indication that the Legislature intended that respondent and other similarly situated OCCs not be subject to the surcharge, we conclude respondent is entitled to the refund.

Affirmed.

Low, P. J., and King, J., concurred.