[No. S037504. Apr. 7, 1997.]

WESTERN SECURITY BANK, N.A., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
BEVERLY HILLS BUSINESS BANK et al., Real Parties in Interest.

VISTA PLACE ASSOCIATES et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
WESTERN SECURITY BANK, N.A., et al., Real Parties in Interest.

## Counsel

Ervin, Cohen & Jessup, Allan B. Cooper, Steven A. Roseman and Garee T. Gasperian for Petitioner and Real Parties in Interest Western Security Bank, N.A.

William K. Wilburn as Amicus Curiae on behalf of Petitioner and Real Parties in Interest Western Security Bank, N.A.

Walker, Wright, Tyler & Ward, John M. Anglin and Robin C. Campbell for Petitioners Vista Place Associates et al.

R. Stevens Condie and Charles T. Collett as Amici Curiae on behalf of Petitioners Vista Place Associates et al.

No appearance for Respondent.

Saxon, Dean, Mason, Brewer & Kincannon, Lewis, D'Amato, Brisbois & Bisgaard, Arter & Hadden, Eric D. Dean, Steven J. Coté, Robert S. Robinson and Michael L. Coates for Real Parties in Interest Beverly Hills Business Bank.

Gibson, Dunn & Crutcher, Dennis B. Arnold, Hill, Wynne, Troop & Meisinger, Neil R. O'Hanlon, Cadwalader,Wickersham & Taft, Robert M. Eller, Joseph M. Malinowski, Kenneth G. McKenna, Michael A. Santoro, John E. McDermott, Kenneth G. McKenna, John C. Kirkland, Stroock & Stroock & Lavan, Julia B. Strickland, Bennett J. Yankowitz, Chauncey M. Swalwell, Brobeck, Phleger & Harrison, George A. Hisert, Jeffrey S. Turner, John Francis Hilson, G. Larry Engel, Frederick D. Holden, Jr., and Theodore W. Graham as Amici Curiae on behalf of Real Parties in Interest Beverly Hills Business Bank.

## Opinion

CHIN, J.—This case concerns the extent to which two disparate bodies of law interact when standby letters of credit are used as additional support for

loan obligations secured by real property. On one side we have California's complex web of foreclosure and antideficiency laws that circumscribe enforcement of obligations secured by interests in real property. On the other side is the letter of credit law's "independence principle," the unique characteristic of letters of credit essential to their commercial utility.

The antideficiency statute invoked in this case is Code of Civil Procedure section 580d. That section precludes a judgment for any loan balance left unpaid after the lender's nonjudicial foreclosure under a power of sale in a deed of trust or mortgage on real property. (See *Roseleaf Corp.* v. *Chieri-ghino* (1963) 59 Cal.2d 35, 43-44 [27 Cal.Rptr. 873, 378 P.2d 97].)[1] The independence principle, in summary form, makes the letter of credit issuer's obligation to pay a draw conforming to the letter's terms completely separate from, and not contingent on, any underlying contract between the issuer's customer and the letter's beneficiary. (See, e.g., Cal. U. Com. Code, § 5114, subd. (1); *San Diego Gas & Electric Co.* v. *Bank Leumi* (1996) 42 Cal.App.4th 928, 933-934 [50 Cal.Rptr.2d 20].)[2]

The Court of Appeal perceived a conflict between the public policies behind Code of Civil Procedure section 580d and the independence principle under the facts of this case. Here, after nonjudicial foreclosure of the real property security for its loan left a deficiency, the lender attempted to draw on the standby letters of credit of which it was the beneficiary. Ordinarily, the issuer's payment on a letter of credit would require the borrower to reimburse the issuer. (See § 5114, subd. (3).) The Court of Appeal considered that this result indirectly imposed on the borrower the equivalent of a

---

[1]In pertinent part, Code of Civil Procedure section 580d provides: "No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property or an estate for years therein hereafter executed in any case in which the real property or estate for years therein has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust."

[2]In 1996, the Legislature completely revised division 5 of the California Uniform Commercial Code, which pertains to letters of credit. (Stats. 1996, ch. 176.) The enactment of chapter 176 repealed the former division 5 and added a new division 5. (Stats. 1996, ch. 176, §§ 6, 7.) The new provisions apply to letters of credit issued after the statute's effective date. (Stats. 1996, ch. 176, § 14.) Letters of credit issued earlier are to be dealt with as though the repeal had not occurred. (Stats. 1996, ch. 176, § 15.) We have no occasion in this case to consider the provisions of the new division 5.

The Legislature (Stats. 1996, ch. 497, § 7) later amended a statutory reference found in California Uniform Commercial Code section 5114 as it existed before chapter 176 was enacted. This second legislative action might appear to restore the prior section 5114 from the repealed former division 5 and possibly leave two sections numbered 5114 in the new division 5. (See Cal. Const., art. IV, § 9; Gov. Code, § 9605.) We have no occasion in this case to address the meaning or effect of this seeming incongruity either.

All references to section 5114 in this opinion are to California Uniform Commercial Code section 5114 as it existed before the 1996 legislation.

prohibited deficiency judgment. The court concluded the situation amounted to a "fraud in the transaction" under section 5114, subdivision (2)(b), one of the limited circumstances justifying an issuer's refusal to honor its letter of credit.

The Legislature soon acted to express a clear, contrary intent. It passed Senate Bill No. 1612 (1993-1994 Reg. Sess.) (hereafter Senate Bill No. 1612) as an urgency measure specifically meant to abrogate the Court of Appeal's holding. (Stats. 1994, ch. 611, §§ 5, 6.) In brief, the aspects of Senate Bill No. 1612 we address provided that an otherwise conforming draw on a letter of credit does not contravene the antideficiency laws and that those laws afford no basis for refusal to honor a draw. After the Legislature's action, we returned the case to the Court of Appeal for reconsideration in light of the statutory changes. On considering the point, the Court of Appeal concluded the Legislature's action was prospective only and had no impact on the court's earlier analysis of the parties' rights and obligations. Accordingly, the Court of Appeal reiterated its former conclusions.

We again granted review and now reverse. The Legislature's manifest intent was that Senate Bill No. 1612's provisions, with one exception not involved here, would apply to all existing loans secured by real property and supported by outstanding letters of credit. We conclude the Legislature's action constituted a clarification of the state of the law before the Court of Appeal's decision. The legislation therefore has no impermissible retroactive consequences, and we must give it the effect the Legislature intended.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 10, 1984, Beverly Hills Savings and Loan Association, later known as Beverly Hills Business Bank (the Bank), loaned $3,250,000 to Vista Place Associates (Vista), a limited partnership, to finance the purchase of real property improved with a shopping center. Vista's general partners, Phillip F. Kennedy, Jr., John R. Bradley, and Peter M. Hillman (the Vista partners), each signed the promissory note. The loan transaction created a "purchase money mortgage," as it was secured by a "Deed of Trust and Assignment of Rents" as well as a letter of credit.

Vista later experienced financial difficulties, and the loan went into default. Vista asked the Bank to modify the loan's terms so Vista could continue operating the shopping center and repay the debt. The Bank and Vista agreed to a loan modification in February 1987, under which the three Vista partners each obtained an unconditional, irrevocable standby letter of

credit in favor of the Bank in the amount of $125,000, for a total of $375,000. These were delivered to the Bank as additional collateral security for repayment of the loan. Under the modification agreement, the Bank was entitled to draw on the letters of credit if Vista defaulted or failed to pay the loan in full at maturity.

Western Security Bank, N.A. (Western) issued the letters of credit at the Vista partners' request. Each partner agreed to reimburse Western if it ever had to honor the letters. Under the agreement, each Vista partner gave Western a $125,000 promissory note.[3]

In December 1990, the Bank declared Vista in default on the modified loan. The Bank recorded a notice of default on February 13, 1991, and began

---

[3]The parties' arrangements reflected a common use of letters of credit. A letter of credit typically is an engagement by a financial institution (the issuer), made at the request of a customer (also referred to as the applicant or account party) to pay a specified sum of money to another person (the beneficiary) upon compliance with the conditions for payment stated in the letter of credit, i. e., presentation of the documents specified in the letter of credit. (See Gregora, *Letters of Credit in Real Property Finance Transactions* (Spring 1991) 9 Cal. Real Prop. J. 1, 1-2.)

A letter of credit transaction involves at least three parties and three separate and independent relationships: (1) the relationship between the issuer and the beneficiary created by the letter of credit; (2) the relationship between the customer and the beneficiary created by a contract or promissory note, with the letter of credit securing the customer's obligations to the beneficiary under the contract or note; and (3) the relationship between the customer and the issuer created by a separate contract under which the issuer agrees to issue the letter of credit for a fee and the customer agrees to reimburse the issuer for any amounts paid out under the letter of credit. (Gregora, *Letters of Credit in Real Property Finance Transactions, supra*, 9 Cal. Real Prop. J. at p. 2; *San Diego Gas & Electric Co.* v. *Bank Leumi, supra*, 42 Cal.App.4th at pp. 932-933; see *Voest-Alpine Intern. Corp.* v. *Chase Manhattan Bank* (2d Cir. 1983) 707 F.2d 680, 682, and *Colorado Nat. Bank, etc.* v. *Bd. of County Com'rs* (Colo. 1981) 634 P.2d 32, 36-38, for a discussion of the history and structure of letter of credit transactions.)

Letters of credit can function as payment mechanisms. For example, in sales transactions a letter of credit assures the seller of payment when parting with goods, while the conditions for payment specified in the letter of credit (often a third party's documentation, such as a bill of lading) assure the buyer the goods have been shipped before payment is made. (Gregora, *Letters of Credit in Real Property Finance Transactions, supra*, 9 Cal. Real Prop. J. at p. 3.) In the letter of credit's role as a payment mechanism, a payment demand occurs in the ordinary course of business and is consistent with full performance of the underlying obligations. (*Ibid.*)

The use of letters of credit has now expanded beyond that function, and they are employed in many other types of transactions in which one party requires assurances the other party will perform. (Gregora, *Letters of Credit in Real Property Finance Transactions, supra*, 9 Cal. Real Prop. J. at p. 3.) When used to support a debtor's obligations under a promissory note or other debt instrument, the so-called "standby" letter of credit typically provides that the issuer will pay the creditor when the creditor gives the issuer written certification that the debtor has failed to pay the amount due under the debtor's underlying obligation to the creditor. (*Ibid.*) Thus, a payment demand under a standby letter of credit indicates that there is a problem— either the customer is in financial difficulty, or the beneficiary and the customer are in a dispute. (*Ibid.*)

nonjudicial foreclosure proceedings. (Civ. Code, § 2924.) It then filed an action against Vista seeking specific performance of the rents and profits provisions in the trust deed and appointment of a receiver.

On June 11, 1991, attorneys for the Bank and Vista signed a letter agreement settling the Bank's lawsuit. In that agreement, Vista promised it would "not take any legal action to prevent [the Bank's] drawing upon [the letters of credit] after the Trustee's Sale of the Vista Place Shopping Center, . . . provided that the amount of the draw by [the Bank] does not exceed an amount equal to the difference between [Vista's] indebtedness and the successful bid of the Trustee's Sale." Vista promised as well not to take any draw-related legal action against the Bank after the Bank's draw on the letters of credit.

On June 13, 1991, the Bank concluded its nonjudicial foreclosure on the shopping center under the power of sale in its deed of trust. The Bank was the only bidder, and it purchased the property. The sale left an unpaid deficiency of $505,890.16.

That same day, the Bank delivered the three letters of credit and drafts to Western and demanded payment of their full amount, $375,000. The Bank never sought to recover the $505,890.16 deficiency from Vista or the Vista partners. About the time that Western received the Bank's draw demand, it also received a written notice from the Vista partners' attorney. The notice asserted that Code of Civil Procedure section 580d barred Western from seeking reimbursement from the Vista partners for any payment on the letters of credit, and that if Western paid, it did so at its own risk.

Western did not honor the Bank's demand for payment on the letters of credit. Instead, on June 24, 1991, Western filed this declaratory relief action against the Bank, as well as Vista and the Vista partners (collectively, the Vista defendants). Western's complaint sought: (1) a declaration that Western is not obligated to accept or honor the Bank's tender of the letters of credit; or, alternatively, (2) a declaration that, if Western must pay on the letters of credit, the Vista partners must reimburse Western according to the terms of their promissory notes.

The Vista defendants cross-complained against Western for cancellation of their promissory notes and for injunctive relief. In July 1991, the Bank filed a first amended cross-complaint, alleging Western wrongfully dishonored the letters of credit, and the Vista defendants breached the agreement not to take legal action to prevent the Bank's drawing on the letters of credit.

The Bank, Western, and the Vista defendants each sought summary judgment. After several hearings and discussions with counsel, which produced a stipulation on the key facts, the court issued its decision on January

23, 1992. By its minute order of that date, the court (1) denied the three motions for summary judgment, (2) severed the Vista defendants' cross-complaint against Western for cancellation of the promissory notes, (3) severed the Bank's amended cross-complaint against the Vista defendants for breach of the letter agreement, and (4) issued a tentative decision on the trial of Western's complaint for declaratory relief and the Bank's amended cross-complaint against Western for wrongful dishonor of the letters of credit.

The trial court signed and filed the judgment on March 26, 1992. The court decreed the Bank was entitled to recover $375,000 from Western, plus interest at 10 percent from June 13, 1991, the date of the Bank's demand, and costs of suit. The court further decreed Western could seek reimbursement from the Vista partners severally, and each Vista partner was obligated to reimburse Western, pursuant to the promissory notes in favor of Western, for its payment to the Bank. Western appealed, and the Vista defendants cross-appealed.

The Court of Appeal, after granting rehearing and accepting briefing by several amici curiae, issued an opinion reversing the trial court on December 21, 1993. In that opinion, the court concluded: "We hold that, under section 580d of the Code of Civil Procedure, an integral part of California's long-established antideficiency legislation, the issuer of a standby letter of credit, provided to a real property lender by a debtor as additional security, *may* decline to honor it after receiving notice that it is to be used to discharge a deficiency following the beneficiary-lender's *nonjudicial* foreclosure on real property. Such a use of standby letters of credit constitutes a 'defect not apparent on the face of the documents' within the meaning of California Uniform Commercial Code section 5114, subdivision (2)(b), and therefore such permissive dishonor does no offense to the 'independence principle.'" (Original italics, fn. omitted.)

In that first opinion, the Court of Appeal also solicited the Legislature's attention: "To the extent that this result will present problems for real estate lenders with respect to the way they now do business (as the Bank and several amici curiae have strongly suggested), it is a matter which should be addressed to the Legislature. We have been presented with two important but conflicting statutory policies. Our reconciliation of them in this case may not prove as satisfactory in another factual context. It is therefore a matter which should receive early legislative attention." (Fn. omitted.)

We granted review, and while the matter was pending, the Legislature passed Senate Bill No. 1612, an urgency statute that the Governor signed on

September 15, 1994. Senate Bill No. 1612 affected four statutes. Section 1 of the bill amended Civil Code section 2787 to state that a letter of credit is not a form of suretyship obligation. (Stats. 1994, ch. 611, § 1.) Section 2 of the bill added Code of Civil Procedure section 580.5, explicitly excluding letters of credit from the purview of the antideficiency laws. (Stats. 1994, ch. 611, § 2.) Section 3 of the bill added Code of Civil Procedure section 580.7, which declares unenforceable letters of credit issued to avoid defaults on purchase money mortgages for owner-occupied real property containing one to four residential units. (Stats. 1994, ch. 611, § 3.) Section 4 of the bill made "technical, nonsubstantive changes" to section 5114. (Stats. 1994, ch. 611, § 4; Legis. Counsel's Dig., Sen. Bill No. 1612 (1993-1994 Reg. Sess.).)

The Legislature made its purpose explicit: "It is the intent of the Legislature in enacting Sections 2 and 4 of this act to confirm the independent nature of the letter of credit engagement and to abrogate the holding [of the Court of Appeal in this case] . . . . [¶] The Legislature also intends to confirm the expectation of the parties to a contract that underlies a letter of credit, that the beneficiary will have available the value of the real estate collateral and the benefit of the letter of credit without regard to the order in which the beneficiary may resort to either." (Stats. 1994, ch. 611, § 5.) The same purpose was echoed in the bill's statement of the facts calling for an urgency statute: "In order to confirm and clarify the law applicable to obligations which are secured by real property or an estate for years therein and which also are supported by a letter of credit, it is necessary that this act take effect immediately." (Stats. 1994, ch. 611, § 6.)

After the Legislature enacted Senate Bill No. 1612, we requested the parties' views on its effect. On February 2, 1995, after considering the parties' responses, we transferred the case to the Court of Appeal with directions to vacate its decision and reconsider the cause in light of the Legislature's action.

On reconsideration, the Court of Appeal determined Senate Bill No. 1612 constituted a substantial change in existing law. Believing there was no clear evidence that the Legislature intended the statute to operate retrospectively, the Court of Appeal thought Senate Bill No. 1612 had only prospective application. Therefore, Senate Bill No. 1612 did not affect the Court of Appeal's prior conclusions on the parties' rights and obligations. The Court of Appeal filed its second opinion on September 29, 1995, mostly repeating its prior reasoning and conclusions. We granted the Bank's petition for review.

## II. Discussion

As the Court of Appeal recognized, we first must determine the effect on this case of the Legislature's enactment of Senate Bill No. 1612.

■ A basic canon of statutory interpretation is that statutes do not operate retrospectively unless the Legislature plainly intended them to do so. (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1207-1208 [246 Cal.Rptr. 629, 753 P.2d 585]; *Aetna Cas. & Surety Co.* v. *Ind. Acc. Com.* (1947) 30 Cal.2d 388, 393 [182 P.2d 159].) A statute has retrospective effect when it substantially changes the legal consequences of past events. (*Kizer* v. *Hanna* (1989) 48 Cal.3d 1, 7 [255 Cal.Rptr. 412, 767 P.2d 679].) A statute does not operate retrospectively simply because its application depends on facts or conditions existing before its enactment. (*Ibid.*) Of course, when the Legislature clearly intends a statute to operate retrospectively, we are obliged to carry out that intent unless due process considerations prevent us. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587, 592 [128 Cal.Rptr. 427, 546 P.2d 1371].)

■ A corollary to these rules is that a statute that merely *clarifies*, rather than changes, existing law does not operate retrospectively even if applied to transactions predating its enactment. We assume the Legislature amends a statute for a purpose, but that purpose need not necessarily be to change the law. (Cf. *Williams* v. *Garcetti* (1993) 5 Cal.4th 561, 568 [20 Cal.Rptr.2d 341, 853 P.2d 507].) Our consideration of the surrounding circumstances can indicate that the Legislature made material changes in statutory language in an effort only to clarify a statute's true meaning. (*Martin* v. *California Mut. B. & L. Assn.* (1941) 18 Cal.2d 478, 484 [116 P.2d 71]; *GTE Sprint Communications Corp.* v. *State Bd. of Equalization* (1991) 1 Cal.App.4th 827, 833 [2 Cal.Rptr.2d 441]; see *Balen* v. *Peralta Junior College Dist.* (1974) 11 Cal.3d 821, 828, fn. 8 [114 Cal.Rptr. 589, 523 P.2d 629].) Such a legislative act has no retrospective effect because the true meaning of the statute remains the same. (*Stockton Sav. & Loan Bank* v. *Massanet* (1941) 18 Cal.2d 200, 204 [114 P.2d 592]; *In re Marriage of Reuling* (1994) 23 Cal.App.4th 1428, 1440 [28 Cal.Rptr.2d 726]; *Tyler* v. *State of California* (1982) 134 Cal.App.3d 973, 976-977 [185 Cal.Rptr. 49].)

One such circumstance is when the Legislature promptly reacts to the emergence of a novel question of statutory interpretation: " 'An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act, where the amendment was adopted soon after the controversy arose concerning the proper interpretation of the statute. . . . [¶] If the amendment was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act—a formal change—rebutting the presumption of substantial change.' (1A Singer, Sutherland Statutory Construction (5th ed. 1993) § 22.31, p.

279, fns. omitted.)" (*RN Review for Nurses, Inc.* v. *State of California* (1994) 23 Cal.App.4th 120, 125 [28 Cal.Rptr.2d 354].)[4]

Even so, a legislative declaration of an existing statute's meaning is neither binding nor conclusive in construing the statute. Ultimately, the interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts. (*California Emp. etc. Com.* v. *Payne* (1947) 31 Cal.2d 210, 213 [187 P.2d 702]; *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 326 [109 P.2d 935]; see *Del Costello* v. *State of California* (1982) 135 Cal.App.3d 887, 893, fn. 8 [185 Cal.Rptr. 582].) Indeed, there is little logic and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an earlier Legislature's enactment when a gulf of decades separates the two bodies. (Cf. *Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 51-52 [276 Cal.Rptr. 114, 801 P.2d 357].) Nevertheless, the Legislature's expressed views on the prior import of its statutes are entitled to due consideration, and we cannot disregard them.

■ "[A] subsequent expression of the Legislature as to the intent of the prior statute, although not binding on the court, may properly be used in determining the effect of a prior act." (*California Emp. etc. Com.* v. *Payne, supra,* 31 Cal.2d at pp. 213-214.) Moreover, even if the court does not accept the Legislature's assurance that an unmistakable change in the law is merely a "clarification," the declaration of intent may still effectively reflect the Legislature's purpose to achieve a retrospective change. (*Id.* at p. 214.) Whether a statute should apply retrospectively or only prospectively is, in the first instance, a policy question for the legislative body enacting the statute. (*Evangelatos* v. *Superior Court, supra,* 44 Cal.3d at p. 1206.) Thus, where a statute provides that it clarifies or declares existing law, "[i]t is obvious that such a provision is indicative of a legislative intent that the amendment apply to all existing causes of action from the date of its enactment. In accordance with the general rules of statutory construction, we must give effect to this intention unless there is some constitutional objection thereto." (*California Emp. etc. Com.* v. *Payne, supra,* 31 Cal.2d at p.

[4]The " 'presumption of substantial change' " mentioned in the quoted passage refers to the presumption that amendatory legislation accomplishing substantial change is intended to have only prospective effect. Some courts have thought changes categorized as merely formal or procedural present no problem of retrospective operation. However, as mentioned above, California has rejected this type of classification: "In truth, the distinction relates not so much to the form of the statute as to its effects. If substantial changes are made, even in a statute which might ordinarily be classified as procedural, the operation on existing rights would be retroactive because the legal effects of past events would be changed, and the statute will be construed to operate only in futuro unless the legislative intent to the contrary clearly appears." (*Aetna Cas. & Surety Co.* v. *Ind. Acc. Com., supra,* 30 Cal.2d at p. 394; cf. *Kizer* v. *Hanna, supra,* 48 Cal.3d at pp. 7-8.)

214; cf. *City of Sacramento* v. *Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 798 [27 Cal.Rptr.2d 545]; *City of Redlands* v. *Sorensen* (1985) 176 Cal.App.3d 202, 211 [221 Cal.Rptr. 728].)

With respect to Senate Bill No. 1612, the Legislature made its intent plain. Section 5 of the bill states, in part: "It is the intent of the Legislature in enacting Sections 2 and 4 of this act[5] to confirm the independent nature of the letter of credit engagement and to abrogate the holding in [the Court of Appeal's earlier opinion in this case], that presentment of a draft under a letter of credit issued in connection with a real property secured loan following foreclosure violates Section 580d of the Code of Civil Procedure and constitutes a 'fraud . . . or other defect not apparent on the face of the documents' under paragraph (b) of subdivision (2) of Section 5114 of the Commercial Code. . . . [¶] The Legislature also intends to confirm the expectation of the parties to a contract that underlies a letter of credit, that the beneficiary will have available the value of the real estate collateral and the benefit of the letter of credit without regard to the order in which the beneficiary may resort to either." (Stats. 1994, ch. 611, § 5.)

The Legislature's intent also was evident in its statement of the facts justifying enactment of Senate Bill No. 1612 as an urgency statute: "In order to confirm and clarify the law applicable to obligations which are secured by real property or an estate for years therein and which also are supported by a letter of credit, it is necessary that this act take effect immediately." (Stats. 1994, ch. 611, § 6.) The Legislature's unmistakable focus was the disruptive effect of the Court of Appeal's decision on the expectations of parties to transactions where a letter of credit was issued in connection with a loan secured by real property. By abrogating the Court of Appeal's decision, the

---

[5]Section 2 of Senate Bill No. 1612 added Code of Civil Procedure section 580.5, which provides in pertinent part: "(b) With respect to an obligation which is secured by a mortgage or a deed of trust upon real property or an estate for years therein and which is also supported by a letter of credit, neither the presentment, receipt of payment, or enforcement of a draft or demand for payment under the letter of credit by the beneficiary of the letter of credit nor the honor or payment of, or the demand for reimbursement, receipt of reimbursement or enforcement of any contractual, statutory or other reimbursement obligation relating to, the letter of credit by the issuer of the letter of credit shall, whether done before or after the judicial or nonjudicial foreclosure of the mortgage or deed of trust or conveyance in lieu thereof, constitute any of the following: [¶] (1) An action within the meaning of subdivision (a) of Section 726, or a failure to comply with any other statutory or judicial requirement to proceed first against security. [¶] (2) A money judgment for a deficiency or a deficiency judgment within the meaning of Section 580a, 580b, or 580d, or subdivision (b) of Section 726, or the functional equivalent of any such judgment. [¶] (3) A violation of Section 580a, 580b, 580d, or 726." (Code Civ. Proc., § 580.5, subd. (b), as added by Stats. 1994, ch. 611, § 2.)

Section 4 of Senate Bill No. 1612 made certain technical, nonsubstantive changes to section 5114, which embodies the independence principle applicable to letter of credit payment obligations. (§ 5114, as amended by Stats. 1994, ch. 611, § 4.)

Legislature intended to protect those parties' expectations and restore certainty and stability to those transactions. If the Legislature acts promptly to correct a perceived problem with a judicial construction of a statute, the courts generally give the Legislature's action its intended effect. (See, e.g., *Escalante* v. *City of Hermosa Beach* (1987) 195 Cal.App.3d 1009, 1020 [241 Cal.Rptr. 199]; *City of Redlands* v. *Sorensen, supra,* 176 Cal.App.3d at pp. 211-212; *Tyler* v. *State of California, supra,* 134 Cal.App.3d at pp. 976-977; but see *Del Costello* v. *State of California, supra,* 135 Cal.App.3d at p. 893, fn. 8 [courts need not accept Legislature's interpretation of statute].) The plain import of Senate Bill No. 1612 is that the Legislature intended its provisions to apply immediately to existing loan transactions secured by real property and supported by outstanding letters of credit, including those in this case.

We next consider whether Senate Bill No. 1612 effected a change in the law, or instead represented a clarification of the state of the law before the Court of Appeal's decision. As mentioned earlier, Senate Bill No. 1612 amended two code sections (§ 5114, Civ. Code, § 2787) and added two sections to the Code of Civil Procedure (§§ 580.5, 580.7). The two code sections Senate Bill No. 1612 amended plainly made no substantive change in the law. The amendments to section 5114, which concerns the issuer's duty to honor a draft conforming to the letter of credit's terms, were "technical, nonsubstantive changes," as the Legislative Counsel's Digest correctly noted. (See Legis. Counsel's Dig., Sen. Bill No. 1612 (1993-1994 Reg. Sess.).)

In the other section amended, Civil Code section 2787, Senate Bill No. 1612 added a statement reflecting an established formal distinction: "A letter of credit is not a form of suretyship obligation." (Stats. 1994, ch. 611, § 1.) Civil Code section 2787 defines a surety or guarantor as "one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor." Generally, a surety's liability for an obligation is secondary to, and derivative of, the liability of the principal for that obligation. (See, e.g., Civ. Code, § 2806 et seq.)

■ By contrast, the liability of the issuer of a letter of credit to the letter's beneficiary is direct and independent of the underlying transaction between the beneficiary and the issuer's customer. (See *San Diego Gas & Electric Co.* v. *Bank Leumi, supra,* 42 Cal.App.4th at pp. 933-934; *Paramount Export Co.* v. *Asia Trust Bank, Ltd.* (1987) 193 Cal.App.3d 1474, 1480 [238 Cal.Rptr. 920]; *Lumbermans Acceptance Co.* v. *Security Pacific Nat. Bank* (1978) 86 Cal.App.3d 175, 178 [150 Cal.Rptr. 69].) Thus, as the amendment to Civil Code section 2787 made clear, existing law viewed a

letter of credit as an independent obligation of the issuing bank rather than as a form of guaranty or a surety obligation. (See, e.g., Dolan, The Law of Letters of Credit: Commercial and Standby Credits (rev. ed. 1996) § 2.10[1], pp. 2-61 to 2-63 (Dolan, Letters of Credit); 3 White & Summers, Uniform Commercial Code (4th ed. 1995) Letters of Credit, § 26-2, pp. 112-117.) The issuer of a letter of credit cannot refuse to pay based on extraneous defenses that might have been available to its customer. (*San Diego Gas & Electric Co.* v. *Bank Leumi, supra,* 42 Cal.App.4th at p. 934.) Absent fraud, the issuer must pay upon proper presentment regardless of any defenses the customer may have against the beneficiary based in the underlying transaction. (*Ibid.*)

Senate Bill No. 1612's remaining statutory addition with which we are concerned,[6] Code of Civil Procedure section 580.5, specified that letter of credit transactions do not violate the antideficiency laws contained in Code of Civil Procedure sections 580a, 580b, 580d, or 726. (Code Civ. Proc., § 580.5, subd. (b)(3).) In particular, the new section specifies that a lender's resort to a letter of credit, and the issuer's concomitant right to reimbursement, do not constitute an "action" under Code of Civil Procedure section 726, or a failure to proceed first against security, regardless of whether they come before or after a foreclosure. (Code Civ. Proc., § 580.5, subd. (b)(1).) Similarly, letter of credit draws and reimbursements do not constitute deficiency judgments "or the functional equivalent of any such judgment." (Code Civ. Proc., § 580.5, subd. (b)(2).)

The Court of Appeal saw Code of Civil Procedure section 580.5 as a change in the law, in large part, because of the analogy it employed to examine the use of standby letters of credit as additional support for loans also secured by real property. The Bank argued a standby letter of credit was the functional equivalent of cash collateral. The Court of Appeal disagreed, instead analogizing standby letters of credit to guaranties and emphasizing the similarities of purpose and function: "No matter how it may be regarded

---

[6]We do not address the effect of section 3 of Senate Bill No. 1612, which added section 580.7 to the Code of Civil Procedure. This section provides, in pertinent part: "(b) No letter of credit shall be enforceable by any party thereto in a loan transaction in which all of the following circumstances exist: [¶] (1) The customer is a natural person. [¶] (2) The letter of credit is issued to the beneficiary to avoid a default of the existing loan. [¶] (3) The existing loan is secured by a purchase money deed of trust or purchase money mortgage on real property containing one to four residential units, at least one of which is owned and occupied, or was intended at the time the existing loan was made, to be occupied by the customer. [¶] (4) *The letter of credit is issued after the effective date of this section.*" (Code Civ. Proc., § 580.7, subd. (b), italics added, as added by Stats. 1994, ch. 611, § 3.) The italicized language, not found in the other statutory changes made by Senate Bill No. 1612, suggests the Legislature intended section 580.7 to have prospective effect only. However, this case does not involve any interpretation of this section or its effect, and so we express no view on those matters.

by the beneficiary, a standby letter is certainly not cash or its equivalent from the perspective of the debtor; in reality, it represents his promise to provide *additional funds* in the event of his *future* default or deficiency, thus confirming its use not as a means of payment but rather as an instrument of guarantee." (Original italics.) The Court of Appeal relied on *Union Bank v. Gradsky* (1968) 265 Cal.App.2d 40 [71 Cal.Rptr. 64] (*Gradsky*) and *Commonwealth Mortgage Assurance Co. v. Superior Court* (1989) 211 Cal.App.3d 508 [259 Cal.Rptr. 425] (*Commonwealth Mortgage*).

*Gradsky* held that a creditor, after nonjudicial foreclosure of the real property security for a note, could not recover the note's unpaid balance from a guarantor. (*Gradsky*, *supra*, 265 Cal.App.2d at p. 41.) Significantly, the court did not find Code of Civil Procedure section 580d's prohibition of deficiency judgments barred the creditor's claim on the guarantor: "It is barred by applying the principles of estoppel. The estoppel is raised as a matter of law to prevent the creditor from recovering from the guarantor after the creditor has exercised an election of remedies which destroys the guarantor's subrogation rights against the principal debtor." (*Gradsky*, *supra*, 265 Cal.App.2d at p. 41.)

The court noted that the guarantor, after payment, ordinarily would be equitably subrogated to the rights and security formerly held by the creditor. (*Gradsky*, *supra*, 265 Cal.App.2d at pp. 44-45; cf. Civ. Code, §§ 2848, 2849.) However, where the creditor first resorts to nonjudicial foreclosure, the guarantor could not acquire any subrogation rights from the creditor because under Code of Civil Procedure section 580d, the nonjudicial sale eliminated both the security and the possibility of a deficiency judgment against the debtor. (*Gradsky*, *supra*, 265 Cal.App.2d at p. 45.) Because the creditor has a duty not to impair the guarantor's remedies against the debtor, the court held the creditor is estopped from pursuing the guarantor after electing a remedy—nonjudicial foreclosure—that eliminated the security for the debt and curtailed the possibility of the guarantor's reimbursement from the debtor. (*Id.* at pp. 46-47.)

However, the rules applicable to surety relationships do not govern the relationships between the parties to a letter of credit transaction. (See Dolan, Letters of Credit, *supra*, § 2.10[1], pp. 2-62 to 2-63.) At the time of this case's transactions, a majority of courts did not grant subrogation rights to an issuer that honored a draw on a credit; the issuer satisfied its own primary obligation, not the debt of another. (*Tudor Dev. Group, Inc. v. U.S. Fid. & Guar. Co.* (3d Cir. 1992) 968 F.2d 357, 361-363; see 3 White & Summers, Uniform Commercial Code, *supra*, Letters of Credit, § 26-15, pp. 211-212; but see Cal. U. Com. Code, § 5117; fn. 2, *ante*, at pp. 237-238.) Nor does the

beneficiary of a letter of credit owe any obligations to the issuer; literal compliance with the letter of credit's terms for payment is all that is required. (Cf. *Paramount Export Co.* v. *Asia Trust Bank, Ltd., supra,* 193 Cal.App.3d at p. 1480; *Lumbermans Acceptance Co.* v. *Security Pacific Nat. Bank, supra,* 86 Cal.App.3d at p. 178.)

*Gradsky* contains additional language suggesting a much broader rule than its holding and analysis warranted. Going beyond the subrogation theory underlying its holding, the court observed: "If . . . the guarantor . . . can successfully assert an action in assumpsit against [the debtor] for reimbursement, the obvious result is to permit the recovery of a 'deficiency' judgment against the debtor following a nonjudicial sale of the security under a different label. It makes no difference to [the debtor's] purse whether the recovery is by the original creditor in a direct action following nonjudicial sale of the security, or whether the recovery is in an action by the guarantor for reimbursement of the same sum." (*Gradsky, supra,* 265 Cal.App.2d at pp. 45-46.) The court also said: "The Legislature clearly intended to protect the debtor from personal liability following a nonjudicial sale of the security. No liability, direct or indirect, should be imposed upon the debtor following a nonjudicial sale of the security. To permit a guarantor to recover reimbursement from the debtor would permit circumvention of the legislative purpose in enacting section 580d." (*Id.* at p. 46.) In view of the reasoning of the court's holding, these additional observations were unnecessary to the case's determination.

*Commonwealth Mortgage* followed *Gradsky* to hold a mortgage guaranty insurer could not enforce indemnity agreements to obtain reimbursement from the debtors for the insurer's payment to the lender after the lender's nonjudicial sale of its real property security. (*Commonwealth Mortgage, supra,* 211 Cal.App.3d at p. 517.) The court said the mortgage guaranty insurance policy served the same purpose as the guaranty in *Gradsky,* and thus *Gradsky* would bar the insurer from being reimbursed under subrogation principles. (*Commonwealth Mortgage, supra,* 211 Cal.App.3d at p. 517.) The court found the substitution of indemnity agreements for subrogation rights did not distinguish the case from *Gradsky.* Relying on the rule that a principal obligor incurs no additional liability on a note by also being a guarantor of it, the court said the agreements added nothing to the debtors' existing liability. (*Commonwealth Mortgage, supra,* 211 Cal.App.3d at p. 517.) Thus, the court said the indemnity agreements could not be viewed as independent obligations. (*Ibid.*) Instead, the court concluded they were invalid attempts to have the debtors waive in advance the statutory prohibition against deficiency judgments. (*Ibid.*)

As did *Gradsky, Commonwealth Mortgage* also inveighed against subterfuges that thwart the purposes of Code of Civil Procedure section 580d.

(*Commonwealth Mortgage, supra,* 211 Cal.App.3d at pp. 515, 517.) "Although section 580d applies by its specific terms only to actions for 'any deficiency upon a note secured by a deed of trust' and not to actions based upon other obligations, the proscriptions of section 580d cannot be avoided through artifice [citation] . . . . In determining whether a particular recovery is precluded, we must consider whether the policy behind section 580d would be violated by such a recovery. [Citation.]" (*Commonwealth Mortgage, supra,* 211 Cal.App.3d at p. 515.) Thus, as did the *Gradsky* court, the *Commonwealth Mortgage* court augmented its opinion with concepts unnecessary to its determination of the case.[7]

The Court of Appeal in this case extrapolated from the *Gradsky* and *Commonwealth Mortgage* precedents a rule that swept far beyond their origins in guaranty and suretyship relationships: "Not only is a *creditor* prevented from obtaining a deficiency judgment against the debtor, but no other person is permitted to obtain what would, in effect, amount to a deficiency judgment." (Original italics.) The Court of Appeal apparently concluded a transaction has such an effect if it "has the practical consequence of requiring the debtor to pay *additional money* on the debt *after* default or foreclosure." (Original italics.) "Thus, we preserve the principle, clearly established by *Gradsky* and *Commonwealth [Mortgage]*, that a lender should not be able to utilize a device of any kind to avoid the limitations of section 580d; and we apply that principle here to standby letters of credit." However, as we have seen, neither *Gradsky* nor *Commonwealth Mortgage* established such a principle as a rule of law. Instead, their statements accentuated the courts' vigilance regarding attempted evasions of the antideficiency and foreclosure laws.

 The Court of Appeal mistook standby letters of credit for such an attempt by seeing them only as a form of guaranty. The court analogized the standby letter of credit to a guaranty because of the perceived functional similarities. One consequence of that analogy was that the court applied to standby letters of credit a rule whose legal justifications originated in the subrogation rights owed to sureties. However, as discussed before, letters of credit—standby or otherwise—are not a form of suretyship, and the rights of the parties to these transactions are not governed by suretyship principles.

---

[7]The precedential value of such statements in *Commonwealth Mortgage* also is clouded by a factual enigma the court left unresolved. As the Court of Appeal recognized, the lender in that case purchased the real property security at the trustee's sale for a full credit bid, which ought to have satisfied the debt. (*Commonwealth Mortgage, supra,* 211 Cal.App.3d at p. 512, fn. 3.) Despite the apparent absence of any deficiency, the court deemed it unnecessary to decide whether a deficiency in fact remained before discussing the effect of Code of Civil Procedure section 580's prohibition of deficiency judgments. (*Commonwealth Mortgage, supra,* 211 Cal.App.3d at p. 515.)

Further, suretyship involves no counterpart to the independence principle essential to letters of credit.

While analogies can improve our understanding of how and why letters of credit are useful, analogies cannot substitute for recognizing the letters' unique qualities. The authors of one leading treatise aptly summarized the point: "In short, a letter of credit is a letter of credit. As Bishop Butler once said, 'Everything is what it is and not another thing.' " (3 White & Summers, Uniform Commercial Code, *supra*, Letters of Credit, § 26-2, p. 117, fn. omitted.)

By focusing on analogies to guaranties, the Court of Appeal also overlooked that the parties in this case specifically intended the standby letters of credit to be additional security.[8] The parties' stipulated facts include that the original loan agreement was secured by a letter of credit, and that "Vista caused [the subsequent letters of credit] to be issued by Western as additional collateral security . . . ." The Court of Appeal found the letters of credit were not security interests in personal property under California Uniform Commercial Code section 9501, subdivision (4), as the Bank had argued. However, we need not determine whether a standby letter of credit comes within the scope of division 9 of the California Uniform Commercial Code. A letter of credit is sui generis as a means of securing or supporting performance of an obligation incurred in a separate transaction. Regardless of whether this idiosyncratic undertaking meets the qualifications for a security interest under the California Uniform Commercial Code, it nevertheless is a form of security for assuring another's performance.

When viewed as additional security for a note also secured by real property, a standby letter of credit does not conflict with the statutory

[8]To the extent that resort to analogy is appropriate for such a singular legal creation as the standby letter of credit, its closest relative would seem to be cash collateral. As one commentator noted: "In view of the relative positions of the beneficiary, the [customer], and the issuing bank, the standby letter of credit is more analogous to a cash deposit left with the beneficiary than it is to the traditional letter of credit or to the performance bond. Because the beneficiary generates all the documents necessary to obtain payment, he has the power to appropriate the funds represented by the standby letter of credit at any time. . . . [¶] Even though the standby letter of credit is functionally equivalent to a cash deposit, it differs from a cash deposit because the customer does not have to part with its own funds until payment is made and it is forced to reimburse the issuing bank. Because the cash-flow burden might otherwise be prohibitive, this is a great advantage to a party who enters into a large number of transactions simultaneously. Moreover, the beneficiary is satisfied; while it does not actually possess the funds, as it would if a cash deposit were used, it is protected by the credit of a financial institution." (Comment, *The Independence Rule in Standby Letters of Credit* (1985) 52 U. Chi. L.Rev. 218, 225-226, fns. omitted; see Dolan, Letters of Credit, *supra*, § 1.06, pp. 1-24 to 1-25, for a discussion of cases illustrating use of standby credits in lieu of cash, bonds, and other security.)

prohibition of deficiency judgments. Code of Civil Procedure section 580d does not limit the security for notes given for the purchase of real property only to trust deeds; other security may be given as well. (*Freedland* v. *Greco* (1955) 45 Cal.2d 462, 466 [289 P.2d 463].) Creditors may resort to such other security in addition to nonjudicial foreclosure of the real property security. (*Ibid.*; *Hatch* v. *Security-First Nat. Bank* (1942) 19 Cal.2d 254, 260 [120 P.2d 869].) ■ A standby letter of credit is a security device created at the request of the customer/debtor that is an obligation owed independently by the issuing bank to the beneficiary/creditor. (See *San Diego Gas & Electric Co.* v. *Bank Leumi*, *supra*, 42 Cal.App.4th at pp. 933-934; *Lumbermans Acceptance Co.* v. *Security Pacific Nat. Bank*, *supra*, 86 Cal.App.3d at p. 178.) A creditor that draws on a letter of credit does no more than call on all the security pledged for the debt. When it does so, it does not violate the prohibition of deficiency judgments.

■ The Legislature plainly intended that the sections of Senate Bill No. 1612 we have addressed would apply to existing loan transactions supported by outstanding letters of credit. We conclude the Legislature's action did not effect a change in the law. Before the Legislature passed Senate Bill No. 1612, an issuer could not refuse to honor a conforming draw on a standby letter of credit—given as additional security for a real property loan—on the basis that the draw followed a nonjudicial sale of the real property security. The Court of Appeal created such a basis, but produced an unprecedented rule without solid legal underpinnings or any real connection to the actual language of the statutes involved.

Therefore, the aspects of Senate Bill No. 1612 we have discussed did not effect any change in the law, but simply clarified and confirmed the state of the law prior to the Court of Appeal's first opinion. Because the legislative action did not change the legal effect of past actions, Senate Bill No. 1612 does not act retroactively; it governs this case. The Legislature concluded that Senate Bill No. 1612 should be given immediate effect to confirm and clarify the law applicable to loans secured by real property and supported by letters of credit. This conclusion was reasonable, particularly in view of the uncertainties the financial community evidently faced after the Court of Appeal's decision. (See, e.g., Murray, What *Should I Do With This Letter of Credit?* (Cont.Ed.Bar 1994) 17 Real Prop. L. Rptr. 133, 138-140.)

In sum, the Court of Appeal erred in concluding the Legislature's enactment of Senate Bill No. 1612 had no effect on this case. The Legislature explicitly intended to abrogate the Court of Appeal's prior decision and make certain the parties' obligations when letters of credit supported loans also secured by real property. The Legislature manifestly intended the

respective obligations of the parties to a letter of credit transaction should remain unaffected by the antideficiency laws, whether those obligations arose before or after enactment of Senate Bill No. 1612. Accordingly, we conclude the judgment of the Court of Appeal should be reversed.[9]

### DISPOSITION

The judgment of the Court of Appeal is reversed, and the cause remanded for further proceedings consistent with this opinion.

George, C. J., Baxter, J., and Brown, J., concurred.

**WERDEGAR, J.,** Concurring and Dissenting.—I concur in the majority's conclusion that California Uniform Commercial Code section 5114, subdivision (2)(b), does not excuse Western Security Bank, N.A. (Western), the issuer, from honoring its letter of credit upon demand for payment by Beverly Hills Business Bank (the Bank), the beneficiary. I would not, however, reach this conclusion under the majority's reasoning that Senate Bill No. 1612 (Stats. 1994, ch. 611) merely declared existing law and that, prior to the bill's enactment, the antideficiency law had no effect on letters of credit. Instead, I agree with Justice Mosk that section 5114 simply does not bear the interpretation that the use of a letter of credit to support an obligation secured by a mortgage or deed of trust constitutes "fraud in the transaction." (Cal. U. Com. Code, § 5114, subd. (2); see conc. & dis. opn. of Mosk, J., *post*, at pp. 262-263.) Thus, Western was obliged to honor the Bank's demand for payment.

The conclusion that the Bank may properly draw upon the letter of credit does not compel the further conclusion that the antideficiency law ultimately offers no protection to Vista Place Asssociates. This is illustrated by a comparison of the majority opinion and the separate opinion of Justice Mosk, which agree on the former point but disagree on the latter. In my view, the Bank's petition for review of a decision rejecting its claim (as

---

[9]Western belatedly claims it should not be liable for prejudgment interest on the amount of the letter of credit it dishonored. It argues it should not be "punished" for seeking a declaration of its rights in a novel and complex case. The Court of Appeal decided that "if it is ultimately determined that Western is liable to the Bank on the letters of credit then it must follow that it is liable for legal interest thereon from and after the day when its obligation to pay on the letters arose. (Civ. Code, § 3287, subd. (a).)" Western did not petition for review of this aspect of the Court of Appeal decision. In any event, Western's liability for prejudgment interest is clear. The award of this interest is not imposed for the sake of punishment. The award depends only on whether Western knew or could compute the amount the Bank was entitled to recover on the letters of credit. (*Fireman's Fund Ins. Co.* v. *Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1173 [286 Cal.Rptr. 146].) The Court of Appeal correctly assessed Western's liability for prejudgment interest.

beneficiary) against Western (as issuer) under superseded law does not present an appropriate vehicle for broader pronouncements on the antideficiency law's effect on other claims and other parties. Because the Legislature in Senate Bill No. 1612 has articulated rules that will govern all future letters of credit, and because letters of credit typically expire after a finite period, the status of residual letters of credit issued before the bill's effective date will soon become an academic question. In contrast, whether the antideficiency law should as a general matter be expansively or narrowly construed remains of vital importance, as demonstrated by the interest in this case shown by amici curiae involved in the purchase and sale of real estate. Under these circumstances, the principle of judicial restraint counsels against the majority's sweeping declaration that the reach of the antideficiency law prior to Senate Bill No. 1612 was too narrow to affect the respective obligations of the parties to a letter of credit transaction.

Underlying the broad declaration just mentioned is the majority's erroneous conclusion that Senate Bill No. 1612 merely clarified existing law and, thus, may be applied to transactions entered into before the bill's operative date. Before that date, the antideficiency law did not distinguish between residential and nonresidential real estate transactions. Now, however, as amended by Senate Bill No. 1612, the antideficiency law does distinguish between residential and nonresidential real estate transactions. New Code of Civil Procedure section 580.7, which the bill added, makes a letter of credit unenforceable when issued to avoid the default of an existing loan and "[t]he existing loan is secured by a purchase money deed of trust or purchase money mortgage on real property containing one to four residential units, at least one of which is owned and occupied, or was intended at the time the existing loan was made, to be occupied by the customer." (*Id.*, subd. (b)(3).)

In light of this provision, we may conclude that letters of credit before Senate Bill No. 1612 either were enforceable in the specified residential real estate transactions but now are not, or were not enforceable in all other real estate transactions but now are. This case does not require us to choose between these possibilities. Either way, Senate Bill No. 1612 went beyond mere clarification to change the effective scope of the antideficiency law. To apply it retroactively would change the legal consequences of past acts. Under these circumstances, it is appropriate to apply the ordinary presumption that a legislative act operates prospectively, and inappropriate to apply to this case the new set of rules articulated in Senate Bill No. 1612.

**MOSK, J.,** Concurring and Dissenting.—I agree with the majority that the issue before us is not whether Senate Bill No. 1612 (1993-1994 Reg. Sess.) (hereafter Senate Bill No. 1612) has retrospective application. It does not.

Rather, we must determine what the law was *before* Senate Bill No. 1612 was enacted to provide, in effect, a "standby letter of credit exception" to the antideficiency statutes.

I disagree with the majority that Senate Bill No. 1612 did not change prior law. In my view, far from merely "clarifying" the "true" meaning of prior law—as the majority implausibly assert—its numerous amendments and additions to the statutes reversed what the Court of Appeal aptly referred to as "the fifty years of consistent solicitude which California courts have given to the foreclosed purchase money mortgagee."[1]

As the majority concede, a legislative declaration of an existing statute's meaning is neither binding nor conclusive. "The Legislature has no authority to interpret a statute. That is a judicial task." (*Del Costello* v. *State of California* (1982) 135 Cal.App.3d 887, 893, fn. 8 [185 Cal.Rptr. 582]; see also *California Emp. etc. Com.* v. *Payne* (1947) 31 Cal.2d 210, 213 [187 P.2d 702]; *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 326 [109 P.2d 935].) As the majority also concede, the legislative interpretation of prior law in this case is particularly unworthy of deference: Nothing in the previous legislative history of letter of credit statutes suggests an intent to create an exception to the antideficiency statutes. Indeed, it is apparently only recently that standby letters of credit have been used in real estate transactions.

Accordingly, unlike the majority, I conclude that before Senate Bill No. 1612, standby letters of credit were not exempt from the antideficiency statutes precluding creditors from obtaining a deficiency judgment from a creditor following nonjudicial foreclosure on a real property loan.

## I.

As the Court of Appeal emphasized, before Senate Bill No. 1612, the potential conflict between the letters of credit statutes and the antideficiency statutes posed a question of first impression, arising from the relatively recent innovation of the use of standby letters of credit as additional security

---

[1]Among other things, Senate Bill No. 1612 amended Civil Code section 2787, added Code of Civil Procedure sections 580.5 and 580.7, and amended California Uniform Commercial Code former section 5114. (See Stats. 1994, ch. 611, §§ 1-6.) It appears, however, that our decision in this matter will have limited application. It will operate only when: (a) a lender obtained a standby letter of credit prior to September 15, 1994, the effective date of Senate Bill No. 1612, to support a transaction secured by a deed of trust against real property; (b) the creditor defaulted on the deed of trust; (c) the lender elected to foreclose by way of trustee's sale rather than through judicial foreclosure; and (d) the lender thereafter demanded payment under the standby letter of credit. In view of the limited precedential value of this case, a better course would have been to dismiss review as improvidently granted.

for real estate loans. Does the so-called "independence principle"—under which letters of credit stand separate and apart from the underlying transaction—constitute an exception to the antideficiency statutes that bar deficiency judgments after a nonjudicial foreclosure on real property?

The majority conclude that even before Senate Bill No. 1612, there was no restriction on the right of a creditor to demand payment on a standby letter of credit after a nonjudicial foreclosure on real property. They are wrong.

Under the so-called "independence principle," the issuer of a standby letter of credit "must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary." (Cal. U. Com. Code, former § 5114, subd. (1), as amended by Stats. 1994, ch. 611, § 4.) In turn, the issuer of a standby letter of credit "is entitled to immediate reimbursement of any payment made under the credit and to be put in effectively available funds not later than the day before maturity of any acceptance made under the credit." (*Id.*, subd. (3).)[2]

A standby letter of credit specifically operates as a means of guaranteeing payment in the event of a future default. "A letter of credit is an engagement by an issuer (usually a bank) to a beneficiary, made at the request of a customer, which binds the bank to honor drafts up to the amount of the credit upon the beneficiary's compliance with certain conditions specified in the letter of credit. The customer is ultimately liable to reimburse the bank. The traditional function of the letter of credit is to finance an underlying customer's beneficiary contract for the sale of goods, directing the bank to pay the beneficiary for shipment. A different function is served by the 'standby' letter of credit, which directs the bank to pay the beneficiary not for his own performance but upon the customer's default, thereby serving as a guarantee device." (Note, *"Fraud in the Transaction": Enjoining Letters of Credit During the Iranian Revolution* (1980) 93 Harv. L.Rev. 992, 992-993, fns. omitted.)

Thus, in practical effect, a standby letter of credit constitutes a promise to provide additional funds in the event of a future default or deficiency. As such, prior to passage of Senate Bill No. 1612, it potentially came up against the restrictions of the antideficiency statutes barring a creditor from obtaining additional funds from a debtor after a nonjudicial foreclosure. Indeed, as

---

[2]As the reference to "goods or documents" in the statute suggests, the drafters appear to have contemplated use of letters of credit in commercial financial transactions, not as additional security in real estate transactions.

the parties concede, nothing in the applicable statutes or legislative history prior to the amendments and additions enacted by Senate Bill No. 1612 created any specific exception to the antideficiency statutes for standby letters of credit. Nor did anything in the applicable statutes or legislative history "imply" that the antideficiency statutes must yield to the so-called "independence principle," based on public policy or otherwise.

We have previously summarized the history and purpose of the antideficiency statutes as follows.

"Prior to 1933, a mortgagee of real property was required to exhaust his security before enforcing the debt or otherwise to waive all rights to his security [citations]. However, having resorted to the security, whether by judicial sale or private nonjudicial sale, the mortgagee could obtain a deficiency judgment against the mortgagor for the difference between the amount of the indebtedness and the amount realized from the sale. As a consequence during the great depression with its dearth of money and declining property values, a mortgagee was able to purchase the subject real property at the foreclosure sale at a depressed price far below its normal fair market value and thereafter to obtain a double recovery by holding the debtor for a large deficiency. [Citations.] In order to counteract this situation, California in 1933 enacted fair market value limitations applicable to both judicial foreclosure sales ([Code Civ. Proc.,] § 726) and private foreclosure sales ([*id.*,] § 580a) which limited the mortgagee's deficiency judgment after exhaustion of the security to the difference between the fair [market] value of the property at the time of the sale (irrespective of the amount actually realized at the sale) and the outstanding debt for which the property was security. Therefore, if, due to the depressed economic conditions, the property serving as security was sold for less than the fair [market] value as determined under section 726 or section 580a, the mortgagee could not recover the amount of that difference in this action for a deficiency judgment. [Citation.]

"In certain situations, however, the Legislature deemed even this partial deficiency too oppressive. Accordingly, in 1933 it enacted section 580b [citation] which barred deficiency judgments altogether on purchase money mortgages. 'Section 580b places the risk of inadequate security on the purchase money mortgagee. A vendor is thus discouraged from overvaluing the security. Precarious land promotion schemes are discouraged, for the security value of the land gives purchasers a clue as to its true market value. [Citation.] If inadequacy of security results, not from overvaluing, but from a decline in property values during a general or local depression, section 580b prevents the aggravation of the downturn that would result if defaulting

purchasers were burdened with large personal liability. Section 580b thus serves as a stabilizing factor in land sales.' [Citations.]

"Although both judicial foreclosure sales and private nonjudicial foreclosure sales provided for identical deficiency judgments in nonpurchase money situations subsequent to the 1933 enactment of the fair value limitations, one significant difference remained, namely property sold through judicial foreclosure was subject to the statutory right of redemption ([Code Civ. Proc.,] § 725a), while property sold by private foreclosure sale was not redeemable. By virtue of sections 725a and 701, the judgment debtor, his successor in interest or a junior lienor could redeem the property at any time during one year after the sale, frequently by tendering the sale price. The effect of this right of redemption was to remove any incentive on the part of the mortgagee to enter a low bid at the sale (since the property could be redeemed for that amount) and to encourage the making of a bid approximating the fair market value of the security. However, since real property purchased at a private foreclosure sale was not subject to redemption, the mortgagee by electing this remedy, could gain irredeemable title to the property by a bid substantially below the fair value and still collect a deficiency judgment for the difference between the fair value of the security and the outstanding indebtedness.

"In 1940 the Legislature placed the two remedies, judicial foreclosure sale and private nonjudicial foreclosure sale on a parity by enacting section 580d [citation]. Section 580d bars 'any deficiency judgment' following a private foreclosure sale. 'It seems clear . . . that section 580d was enacted to put judicial enforcement on a parity with private enforcement. This result could be accomplished by giving the debtor a right to redeem after a sale under the power. The right to redeem, like proscription of a deficiency judgment, has the effect of making the security satisfy a realistic share of the debt. [Citation.] By choosing instead to bar a deficiency judgment after private sale, the Legislature achieved its purpose without denying the creditor his election of remedies. If the creditor wishes a deficiency judgment, his sale is subject to statutory redemption rights. If he wishes a sale resulting in nonredeemable title, he must forego the right to a deficiency judgment. In either case his debt is protected.' " (*Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 600-602 [125 Cal.Rptr. 557, 542 P.2d 981], fns. omitted.)

Over the several decades since their enactment, our courts have construed the antideficiency statutes liberally, rejecting attempts to circumvent the proscriptions against deficiency judgments after nonjudicial foreclosure. "It is well settled that the proscriptions of section 580d cannot be avoided through artifice . . . ." (*Rettner* v. *Shepherd* (1991) 231 Cal.App.3d 943,

952 [282 Cal.Rptr. 687]; accord, *Freedland* v. *Greco* (1955) 45 Cal.2d 462, 468 [289 P.2d 463] [In construing the antideficiency statutes, " 'that construction is favored which would defeat subterfuges, expediencies, or evasions employed to continue the mischief sought to be remedied by the statute, or . . . to accomplish by indirection what the statute forbids.' "]; *Simon* v. *Superior Court* (1992) 4 Cal.App.4th 63, 78 [5 Cal.Rptr.2d 428].)

Nor can the antideficiency protections be waived by the borrower at the time the loan was made. (See Civ. Code, § 2953 [such waiver "shall be void and of no effect"]; *Valinda Builders, Inc.* v. *Bissner* (1964) 230 Cal.App.2d 106, 112 [40 Cal.Rptr. 735] [The debtor's waiver agreement was "contrary to public policy, void and ineffectual for any purpose."].)

In this regard, as the Court of Appeal observed, two decisions are of particular relevance here: *Union Bank* v. *Gradsky* (1968) 265 Cal.App.2d 40 [71 Cal.Rptr. 64] (hereafter *Gradsky*), and *Commonwealth Mortgage Assurance Co.* v. *Superior Court* (1989) 211 Cal.App.3d 508 [259 Cal.Rptr. 425] (hereafter *Commonwealth*).

In *Gradsky*, the Court of Appeal held that Code of Civil Procedure section 580d operated to preclude a lender from collecting the unpaid balance of a promissory note from the guarantor after a nonjudicial foreclosure on the real property securing the debt. It concluded that if the guarantor could successfully assert an action against the borrower for reimbursement, "the obvious result is to permit the recovery of a 'deficiency' judgment against the [borrower] following a nonjudicial sale of the security under a different label." (*Gradsky, supra,* 265 Cal.App.2d at pp. 45-46.) "The Legislature clearly intended to protect the [borrower] from personal liability following a nonjudicial sale of the security. No liability, direct or indirect, should be imposed upon the [borrower] following a nonjudicial sale of the security. To permit a guarantor to recover reimbursement from the debtor would permit circumvention of the legislative purpose in enacting section 580d." (*Id.* at p. 46.)

In *Commonwealth*, borrowers purchased real property with a loan secured by promissory notes provided by a bank. At the bank's request, they obtained policies of mortgage guarantee insurance to secure payment on the promissory notes. They also signed indemnity agreements promising to reimburse the mortgage insurer for any funds it paid out under the policy. When the borrowers defaulted on the promissory notes, the bank foreclosed nonjudicially on the real property. It then collected on the mortgage insurance; the mortgage insurer then brought an action for reimbursement on the indemnity agreements.

The Court of Appeal in *Commonwealth* held that reimbursement was barred by Code of Civil Procedure section 580d. It rejected the argument that the indemnity agreements constituted separate and independent obligations: "The instant indemnity agreements add nothing to the liability [the borrowers] already incurred as principal obligors on the notes . . . . To splinter the transaction and view the indemnity agreements as separate and independent obligations . . . is to thwart the purpose of section 580d by a subterfuge [citation], a result we cannot permit." (*Commonwealth, supra,* 211 Cal.App.3d at p. 517.)

The majority's attempt to distinguish *Gradsky* and *Commonwealth*, by characterizing them as grounded in subrogation law, is unpersuasive. Indeed, in *Commonwealth*, subrogation law was not directly in issue; the indemnity obligation provided a contract upon which to base collection.[3]

The majority miss the point. As the Court of Appeal in this matter explained: "*Gradsky* and *Commonwealth* reflect the strong judicial concern about the efforts of secured real property lenders to circumvent section 580d by the use of financial transactions between debtors and third parties which involve post-nonjudicial foreclosure debt obligations for the borrowers. Their common and primary focus is on the lender's requirement that the debtor make arrangements with a third party to pay a portion or all of the mortgage debt remaining after a foreclosure, i.e., to pay the debtor's deficiency."

The Legislature, in enacting Senate Bill No. 1612, expressly abrogated the Court of Appeal decision in this matter and gave primacy to the so-called "independence principle" as against the antideficiency protections. Its additions and amendments to the statutes—lobbied for, and drafted by, the California Bankers Association—significantly altered prior law. Senate Bill No. 1612, therefore, should have prospective application only.

---

[3]In any event, the analogy between standby letters of credit and guarantees is not as "forced" as the majority would suggest. As one commentator recently observed, "upon closer analysis, the borders between standby credits and contracts of guarantee are not so well settled as they may first appear." (McLaughlin, *Standby Letters of Credit and Guaranties: An Exercise in Cartography* (1993) 34 Wm. & Mary L.Rev. 1139, 1140; see also Alces, *An Essay on Independence, Interdependence, and the Suretyship Principle* (1993) 1993 U. Ill. L.Rev. 447 [rejecting distinction between letters of credit and "secondary obligations," i.e., guarantees and sureties].) Moreover, "courts have long recognized that, in a sense, issuers of credits 'must be regarded as sureties.' [Citation.] A seller of goods often insists on a commercial letter of credit because he is unsure of the buyer's ability to pay. The standby letter of credit arises out of situations in which the beneficiary wants to guard against the applicant's nonperformance. In both instances, the credit serves in the nature of a guaranty." Dolan, The Law of Letters of Credit: Commercial and Standby Credits (2d ed. 1991) § 2.10[1], pp. 2-61 to 2-62.)

In their strained attempt to reach the conclusion that Senate Bill No. 1612 governs this case, the majority adopt the fiction that a standby letter of credit is an "idiosyncratic" form of "security" or the "functional equivalent" of cash collateral. They offer no sound support for such an approach. There is none.[4]

As the Court of Appeal observed, from the perspective of the debtor, a standby letter of credit is not cash or its equivalent. It is, instead, a promise to provide additional funds *in the event of future default or deficiency* and has the practical consequence of requiring the debtor to pay *additional* money on the debt *after* default or foreclosure.[5] Moreover, unlike cash, which can be pledged as collateral security only once, a standby letter of credit does not require a debtor to part with its own funds until payment is made and thus permits a borrower to use standby letters of credit in a large number of transactions separately. Cash collateral, by contrast, does not impose personal liability on the borrower following a trustee's sale and does not encourage speculative lending practices.

As the Court of Appeal observed: "For us to conclude that such use of a standby letter of credit is the same as an increased cash investment (whether or not from borrowed funds) is to deny reality and to invite the very overvaluation and potential aggravation of an economic downturn which the antideficiency legislation was originally enacted to prevent."

---

[4]The principal "authority" cited by the majority for the proposition that standby letters of credit are the "functional equivalent" of cash collateral is a student law review note published over a decade ago—and apparently never cited in any case in California or elsewhere. (Comment, *The Independence Rule in Standby Letters of Credit* (1985) 52 U. Chi. L.Rev. 218.) Significantly, the note nowhere discusses the use of standby letters of credit in transactions involving purchase money mortgages or the potential conflict between the so-called "independence principle" and antideficiency statutes. Indeed, it assumes that "[t]hose who engage in standby letter of credit transactions are usually large corporate or governmental entities with access to high-quality counsel and are thus in a position to evaluate and respond to the risks involved." (*Id.* at p. 238.) Needless to say, that is often *not* the case in real property transactions, particularly those involving residential property. As a leading commentator observed: "the motivation of the parties to a real estate secured transaction is frequently other than purely commercial, and their relative bargaining power is often grossly disproportionate." (Hetland & Hansen, *The "Mixed Collateral" Amendments to California's Commercial Code—Covert Repeal of California's Real Property Foreclosure and Antideficiency Provisions or Exercise in Futility?* (1987) 75 Cal.L.Rev. 185, 188, fn. omitted.)

[5]Although it appears to be uncommon, an issuer of a standby letter of credit may demand security from its customer in the form of cash collateral or personal property as a condition for issuing the letter of credit. In the event of a draw on the letter of credit, the issuer would then have recourse to the pledged security, up to the value of the draw, without requiring its customer to pay additional money. Whether a real estate lender's draw on a standby letter of credit backed by security, and not by a mere promise to pay, would fall within the mixed security rule is a difficult question that need not be addressed here.

## II.

The Court of Appeal correctly concluded that, before Senate Bill No. 1612, there was no implied exception to the antideficiency statutes for letters of credit. It erred, however, in holding that Western Security Bank, N.A. (Western) could have refused to honor the letter of credit on the ground that the Beverly Hills Business Bank (Bank), in presenting the letters of credit after a nonjudicial foreclosure, worked an "implied" fraud on Vista Place Associates (Vista).

The Court of Appeal cited former California Uniform Commercial Code former section 5114, subdivision (2)(b), which provides that when there has been a notification from the customer of "fraud, forgery or other defect not apparent on the face of the documents," the issuer "may"—but is not obligated to—"honor the draft or demand for payment."(Cal. U. Com. Code, § 5114, subd. (2)(b) as amended by Stats. 1994, ch. 611, § 4.)[6] The statute is inapplicable under the present facts.

Western, presented with a demand for payment on a letter of credit, was limited to determining whether the documents presented by the beneficiary complied with the letter of credit—a purely ministerial task of comparing the documents presented against the description of the documents in the letter of credit. If the documents comply on their face, the issuer must honor the draw, regardless of disputes concerning the underlying transaction. (*Lumbermans Acceptance Co.* v. *Security Pacific Nat. Bank* (1978) 86 Cal.App.3d 175, 178 [150 Cal.Rptr. 69]; Cal. U. Com. Code, former § 5109, subd. (2) as added by Stats. 1963, ch. 819, § 1, p. 1934.) Thus, in this case, Western was not entitled to look beyond the documents presented by the Bank and refuse to honor the standby letter of credit based on a potential violation of the antideficiency statutes in the underlying transaction.

In my view, the concurring and dissenting opinion by Justice Kitching in the Court of Appeal correctly reconciled the policies behind standby letter of credit law and the antideficiency provisions of Code of Civil Procedure section 580d, as they existed *before* Senate Bill No. 1612. Thus, I would conclude that Western was obligated, under the so-called "independence principle," to honor the standby letter of credit presented by the Bank. None of the limited exceptions to that rule applied. Western was not, however, without recourse. It was entitled to seek reimbursement from Vista, pursuant

---

[6]An issuer's obligations and rights are now governed by California Uniform Commercial Code section 5108, enacted in 1996 as part of Senate Bill No. 1599. (Stats. 1996, ch. 176, § 7.) The same legislation repealed section 5114, relating to the issuer's duty to honor a draft or demand for payment, as part of the repeal of division 5, Letters of Credit. (Stats. 1996, ch. 176, § 6.)

to former California Uniform Commercial Code former section 5114, sub-division (3) and its promissory notes. Vista, in turn, could seek disgorgement from the Bank, if it has not legally waived its protection under Code of Civil Procedure section 580d—an issue that is not before us and should be remanded to the trial court. As Justice Kitching's concurrence and dissent concluded, "[t]his procedure would retain certainty in the California letter of credit market while implementing the policies supporting section 580d."

Kennard, J., concurred.